Case 1:17-cv-22071-JJO   Document 66-2   Entered on FLSD Docket 02/12/2018   Page 1 of 25

# *EXPERT REPORT*

# CHERYL MILBRATH
# v.
# NCL (BAHAMAS) LTDE

## CASE NO.: 1:17-CV-22071

## Report Number: R171209

## December 21, 2017

REPORT PREPARED BY:

Francisco J. De Caso Basalo, Ph.D., LEED A.P.
5804 Leonardo St.
Coral Gables FL, 33146
305-450-9291
Email: fdcb@fdcbengineering.com

**Expert Report**

| Controls: | |
|---|---|
| Superseded Report | New report |
| Reason for Revision | n/a |
| Effective Date | December 21, 2017 |

| Report Approval: | |
|---|---|

*I indicate that I have authored and reviewed this report and agree with the contents it presents, and I approve for its release.*

Name:        Francisco J. De Caso Basalo

Signature:

Date:        December 21, 2017

**TABLE OF CONTENTS**

| SECTION | TITLE | PAGE |
|---------|-------|------|
| **1.** | **INTRODUCTION** | **4** |
| *1.1.* | *PURPOSE OF REPORT* | *4* |
| *1.2.* | *REPORT PREPERATION* | *4* |
| *1.3.* | *QUALIFICATIONS* | *4* |
| *1.4.* | *DOCUMENTATION* | *5* |
| *1.5.* | *REPORT REQUETSED BY* | *5* |
| **2.** | **INVESTIGATION** | **6** |
| *2.1.* | *COMPLAINT* | *6* |
| *2.2.* | *VESSEL BACKGROUND* | *6* |
| *2.3.* | *VESSEL INSPECTION* | *6* |
| *2.4.* | *STANDARDS AND GUIDELINES* | *6* |
| **3.** | **METHODOLOGY** | **7** |
| *3.1.* | *SCOPE OF ANALYSIS* | *7* |
| *3.2.* | *PROBLEM DEFINITION* | *7* |
| *3.3.* | *HYPOTHESIS* | *8* |
| *3.4.* | *DESIGN OF EXPERIMENTS* | *8* |
| *3.5.* | *EXPERIMENTS* | *8* |
| *3.6.* | *INTERPRETATION* | *8* |
| **4.** | **EXPERIMENTS, ANALYSIS & DISCUSSION** | **9** |
| *4.1.* | *VISUAL ANALYSIS* | *9* |
| *4.2.* | *LIGHTING EVALUATION* | *12* |
| *4.3.* | *DOORWAY EVALUATION* | *17* |
| **5.** | **INTERPRETATIONS** | **20** |
| *5.1.* | *VISUAL ANALYSIS* | *20* |
| *5.2.* | *LIGHTING EVALUATION* | *20* |
| *5.3.* | *DOORWAY EVALUATION* | *21* |
| **6.** | **CONCLUSIONS** | **24** |
| **7.** | **REFERENCES** | **25** |

## 1.      INTRODUCTION

### 1.1.    PURPOSE OF REPORT

This report provides findings, observations and conclusions as part of the investigation subsequent to the document review and inspection of the Norwegian Epic on the matter arising from the litigation relating the complaint by Ms. Cheryl Milbrath v. NCL (Bahamas) LTD, a Bermuda Company d/b/a Norwegian Cruise Line, in the United States District Court Southern District of Florida, as referenced within CASE NO.: 1:17-CV-22071. The overarching objective of the report is to provide my opinions on the plausible cause(s) of the subject incident based on empirical evidence, standard requirements and or guidelines relevant to this matter.

### 1.2.    REPORT PREPERATION

This report and its contents have been prepared by myself, Francisco J. De Caso Basalo, Ph.D., LEED A.P. The opinions contained herein are based on my professional knowledge, education, and training as an engineer, scientist and researcher. I disclose no known conflict of interest with known parties. Preparation of this report included the review of various documents related to the litigation as well as studies, standards, codes, provisions and guidelines.

This report is based on the information currently available to me, and if additional information is subsequently provided, I reserve the right to amend or supplement my opinions. Documents aided the preparation of this report are referenced within the report.

### 1.3.    QUALIFICATIONS

I received my MEng in Civil and Architectural Engineering from the University of Bath, England (UK), and my PhD in Civil Engineering from the University of Miami, where I am currently an Associate Scientist. My broad area of research is in civil and structural engineering, including material science, testing and analysis applied to the built environment. These activities encompass a broad spectrum of expertise related to understanding and behavior of materials and systems, characterization of different physical and mechanical material parameters, effect of aging and durability in materials, performance requirements and design related issues of the built environment. I am also the Associate Director of the Center for Integration of Composites into Infrastructure (CICI), a National Science Foundation Industry/University cooperative research center involved in technology transfer composite systems for infrastructure applications. I am actively engaged in sponsored research from federal, state agencies, and private industry. I am an active member of numerous professional organizations dedicated to the development as well as review of test methods, standards, guidelines and codes amongst some are the ASTM International, International Code Council Evaluation Service (ICC-ES), American Concrete Institute (ACI), and American Society of Civil Engineers (ASCE). Furthermore, I am the manager of the Structures and Materials Laboratory, an ISO 17025 accredited laboratory that performs testing and evaluation on a variety of different materials and structures. A copy of my CV is attached, containing my education and licenses, participation in professional organizations, as well as published conference and peer reviewed papers, participation as a reviewer in high impact journal publications, relevant awards, research projects and other relevant information to demonstrate my qualifications to render opinions to the aforementioned matter.

1.4.    DOCUMENTATION

The following relevant case documents regarding the litigation have been reviewed in preparation for this report, stated in no particular order:

1.4.1.     Complaint for damages and demand for a trial by Jury
1.4.2.     Plaintiff's initial disclosures pursuant to rule 26
1.4.3.     Defendant's rule 26 initial disclosures
1.4.4.     Defendant's answer and affirmative defenses
1.4.5.     Plaintiff's notice of serving first interrogatories to Defendant
1.4.6.     Plaintiff's first requests for production to Defendant
1.4.7.     Defendant's notice of serving unverified answers to Plaintiff's first interrogatories, dated August 11, 2017
1.4.8.     Defendant's notice of serving amended answers to Plaintiff's first interrogatories, dated August 11, 2017
1.4.9.     Defendant's responses to Plaintiff's first request for production, dated August 11, 2017
1.4.10.    Defendant's amended responses to Plaintiff's first request for production, dated August 11, 2017
1.4.11.    Plaintiff's revised first request for entry upon vessel for inspection and other purposes
1.4.12.    Defendant's initial request for production of documents and electronically-stored information to plaintiff
1.4.13.    Defendant's notice of serving initial interrogatories to Plaintiff
1.4.14.    Plaintiff's response to Defendant's request for production of documents and electronically-stored information
1.4.15.    Plaintiff's unverified notice of serving responses to Defendant's initial interrogatories
1.4.16.    Plaintiff's verified notice of serving responses to Defendant's initial interrogatories.
1.4.17.    Defendant's responses to Plaintiff's second requests for production, dated December 8, 2017
1.4.18.    Defendant's amended responses to Plaintiff's second request for production, dated December 8, 2017
1.4.19.    Michelle Williams-Inman deposition transcript
1.4.20.    Seven second portion of Safety Channel 10 video
1.4.21.    Defendant's notice of serving amended answers to Plaintiff's second interrogatories, dated December 8, 2017
1.4.22.    Defendant's notice of serving responses to Plaintiff's second interrogatories, dated December 8, 2017

1.5.    REPORT REQUETSED BY

The report was prepared for:
        Aronfeld Trial Lawyers
        Attn: Spencer Marc Aronfeld, Esq.
        Board Certified Trial Lawyer
        3132 Ponce De Leon Boulevard
        Coral Gables, Florida 33134
        aronfeld@aronfeld.com

## 2.   INVESTIGATION

### 2.1.   COMPLAINT

The complaint is related to the incident, which occurred November 20, 2016 on or about 11.00 pm on board the vessel Norwegian Epic, on deck 15, port, aft at the entrance to the female public restroom. Based on the review of the aforementioned documents, as well as a verbal explanation provided by the Plaintiff, Ms. Cheryl Milbrath, prior to the inspection, it can be inferred that sequence of events leading to the incident was as follows. Ms. Milbrath was on board Norwegian Epic as part of a wedding party and following dinner and walking around the deck, she was heading towards the cruise sponsored dance party. While making her way to the sponsored event, she visited the restroom, and while entering the restroom she tripped and fell suffering serious injuries. To this end, the area around the female restroom and the restroom entrance on deck 15, port, was inspected to form an opinion and determine the likelihood of the potential causes of the subject incident.

### 2.2.   VESSEL BACKGROUND

Based on public information the Norwegian Epic is a cruise ship built by STX Europe Chantiers de l'Atlantique shipyard in Saint-Nazaire, France. It was then launched in July 2009, and entered in service on June 17, 2010. It is a 1,081-foot long vessel with a 155,873 gross tonnage.

### 2.3.   VESSEL INSPECTION

On December 9, 2017, starting at approximately 9.00 am I initiated the inspection on deck 15, of the Norwegian Epic while docked at Port Canaveral. The inspection lasted approximately one hour and took place in and around the female restroom on deck 15, port, aft. The purpose of the inspection consisted in measuring, surveying, photographing and evaluating the area of the subject incident.

### 2.4.   STANDARDS AND GUIDELINES

The following reviewed relevant design guidelines, standard requirements and documents in relation to determination of likely cause/s resulting in the incident under evaluation include:

2.4.1.   American with Disabilities (ADA), Standards for Accessible Design, and Accessibility Guidelines (ADAAG) 2010.
2.4.2.   NFPA National Fire Protection Association, Life Safety Code 101.
2.4.3.   IBC-2015, International Building Code.
2.4.4.   IES Lighting Handbook. 10th ed. Illuminating Engineering Society of North America, 2000.

## 3.     METHODOLOGY

The scientific method, a fundamental approach applied in forensic engineering, was the methodology implemented to determine the probable cause(s) of the aforementioned complaint. The scientific method can be simplified into generalized steps as follows:

- i)    Identify and define a problem or circumstance;
- ii)   Form a hypothesis or proposition that can be tested;
- iii)  Design experiment/s to test the hypothesis or proposition;
- iv)   Conduct experiments and evidence to test the hypothesis; and
- v)    Interpret results based on the analysis from experiments.

To this end, the scientific methodology was used in this inspection and evaluation to establish or demonstrate that a particular independent variable *the cause* (i.e. what produced the slip/fall) has an influence on the dependent variable, *the effect* (i.e. the slip/fall). The three criteria for establishing cause and effect relationships include: a) association: establishing causality between independent and dependent variable; b) temporal precedence: determining the time order of the variables, the cause has to occur before the effect; and c) non-spuriousness: ruling out alternative explanations for the observed relationship between variables. The scientific methodology is detailed in the following section as a means to provide the reader with the rational for the undertaken inspection scope of activities, as well as to support and validate the opinions and conclusions provided herein.

### 3.1.   SCOPE OF ANALYSIS

The risk of a slip and/or fall occurring is a multimodal function, and is most often a combination of factors that leads to a slip/fall. The competence press model (Lawton and Nahemow 1973) can serve as a structure to assess the risk of a slip/fall event. The model suggests that events or falls are a function of individual, environmental, and interactive factors, represented by the equation:

$$B = f \{P, E, (P*E)\}$$

where $B$ is the risk of a fall (reference by Lawton and Nahemow as *behavior*); $P$ are the intrinsic factors (reference by Lawton and Nahemow as *person*); $E$ are the extrinsic factors (reference by Lawton and Nahemow as *environment*); and $P*E$ is the product resulting from the interaction between the $P$ and $E$. Based on this model to determine the risk of falls, and thus of probability of each factor in causing a slip/fall from happening, $B$ it is necessary to determine the elements on the other side of the equation: $P, E,$ and $P*E$. To this end, the scope of this cause-effect analysis in relation to the incident, $E$ is the only factor under evaluation; where built environment within the incident location is assessed. The methodology will focus on evidence-based evaluations and analysis of $E$ only. Extrinsic fall risk factors can vary from lighting levels, design issues, defects, lack of maintenance, to the type of flooring and evaluating this factors can help in determining the likelihood of environmental factors being the cause of a slip and or fall event.

### 3.2.   PROBLEM DEFINITION

Given that tripping and fall incidents are precipitated by intrinsic and extrinsic factors; and since the scope of this report is limited to environmental factors, the problem definition when implementing the scientific method can be simply achieved by the formulation of a question. In this case it can be formulated as follows: *What is the likelihood that the environmental factors caused the fall of Ms. Cheryl Milbrath?*

### 3.3.   HYPOTHESIS

A combination of environmental deficiencies related to the artificial lighting, deck surface and design, maintenance, and operation of doorways are usually the causes in cruise ship falls, as demonstrated by research (Peake et. al. 1999, Gauchard 2001, Lois 2004, Jensen 2005, Dahl 2010, Dusk 2011, Chang 2014). In formulating the problem definition, background information can be obtained regarding the specific event (based on the documentation indicated in Section 1.4) and expert knowledge, which provides basis to establish the following general hypothesis:

  ➢ The cause of Ms. Cheryl Milbrath's fall is a combination of environmental deficiencies including, the floor surface, lighting conditions and doorway.

### 3.4.   DESIGN OF EXPERIMENTS

The ideal experiment to test the hypothesis would be to reproduce the incident and then modify different environmental variables (e.g. lighting conditions…etc) and engage representative human participants to access the restroom and measure the number of falls and their causes based on the variables being tested. Cleary, this would be an impossibility; nonetheless, the scientific methodology allows to investigate each variable and test it independently, and compare relationships with the larger body of knowledge and recognized industry standards. The experiments conducted to test the abovementioned hypothesis are reflected in the scope of activities undertaken during the vessel inspection. The description and rationale for the design of the experiments conducted is described as follows:

  i)   **Visual analysis:** Describe the area of the incident and record relevant observations to test the hypothesis.
  ii)  **Lighting evaluation:** Evaluate the presence and magnitude of available lighting to test the hypothesis.
  iii) **Doorway evaluation:** Evaluate the doorway geometry, condition, operation and maintenance to test the hypothesis.

### 3.5.   EXPERIMENTS

Refer to Chapter 4, which includes the detailed information on the data collected, observations and tests conducted during the inspection with the aim to test the hypothesis.

### 3.6.   INTERPRETATION

Refer to Chapter 5, which provides the interpretation of the results from the experiments as well as peer reviewed journal publications with the aim to test the hypothesis.

## 4.    EXPERIMENTS, ANALYSIS & DISCUSSION

In order to test the hypothesis related to the cause of the fall by Ms. Cheryl Milbrath, the experiments as described below were conducted, followed by an analysis and discussion, which includes photographs, presented as evidence of the vessel inspection.

### 4.1.    VISUAL ANALYSIS

The location of the incident under evaluation surround the pubic female restroom on deck 15, port, aft encompassing an exterior covered galley way on board the vessel Norwegian Epic, docked at Port Canaveral. The following relevant site observations were made during the inspection's visual analysis. Interpretations of the stated observations are provided in Section 5.

4.1.1.    The inspection took place during an overcast day with intermittent showers. The average temperature was about $59^{0}$F and 53% relative humidity, as seen in Figure 1, where the covered galley way towards the female restroom can be seen (refer to sign on right side, top of arch bridge) as well as looking across the galley way from port to starboard, and vice versa.

4.1.2.    A general view of the inspected area can be seen in Figure 1. The female restroom is located in the covered galley way, identified by the wooden (teak) door with a circular port hole.

4.1.3.    This general area provides access from the sides of the vessel to the aft elevators and stairs, located by the Spice H20 Pool Bar and Grill as seen in the vessel deck diagram shown in Figure 2.

4.1.4.    The area is also an ADA (American with Disabilities) accessible path, providing access to the ADA elevator, as see in Figure 3.

4.1.5.    The specific incident location where Ms. Cheryl Milbrath tripped and fell, is identified as the doorway providing access to the female public restroom, shown both with the door open and closed in Figure 4. Observations related to the doorway will be provided within Section 4.3 of this report.

4.1.6.    CCTV monitoring cameras were present in the surrounding inspection area, specifically located by the ADA elevator access – pointing towards the restroom doorway; and behind the restroom doorway – pointing away from the doorway, as seen in Figure 3 and Figure 5, respectively.

4.1.7.    The surface floor in the inspection area was homogeneous in color, of a composite type, and continued by folding at the floor-wall corner acting as a baseboard (or skirt), as seen in Figure 1. Whereas the floor surface inside the restroom was a tile type, of darker color, as seen in Figure 4.

4.1.8.    The surface immediately in front of the door had an average slope (based on three measurements) of 0.26-degress and 0.60-degrees, parallel and perpendicular to the door.

4.1.9.    The overall condition of the surface immediately in front of the door in the dry condition appeared to provide reasonable levels of traction based on a qualitative evaluation.



Figure 1 – View of deck 15, port, aft, access to the female restroom (top); looking from starboard to port (bottom left); and port to starboard (bottom right) across the covered galley



Figure 2 – Norwegian Epic Deck 15 diagram

**Expert Report**


Figure 3 – ADA elevator, signs and access


Figure 4 – Female restroom doorway, identified as the incident location



Figure 5 – CCTV outside the female restroom

## 4.2.    LIGHTING EVALUATION

To test the hypothesis, an evaluation of the available lighting around the incident area was conducted. This included both a quantitative and qualitative lighting survey. The levels of horizontal lux, known as the illuminance and luminous emittance levels, were measured provided by the available light at the inspection area during the time of the inspection. The lux provides a measure of the intensity of light that hits a surface, as perceived by the human eye. The lux was measured using a white LED light meter, Model LT40 by Extech Instruments. Interpretations of the lighting evaluation are provided in Section 5. The following was tested and recorded:

4.2.1.    Twelve artificial light sources, were present in the covered galley area, arranged in two rows with six lights in each row as seen in Figure 6.

4.2.2.    The exterior artificial light fixture typology is presented in Figure 7.

4.2.3.    The exterior artificial lights were not on at the time of the inspection. Although lights were requested to be turned on during the inspection, this was not possible since as disclosed by the Defendant's legal council present during the inspection, the lights are on a timer system, and can only be turned on manually by the Captain. Given that passenger-boarding activities were underway at the time of the inspections, turning the lights manually was not possible.

4.2.4.    The restroom lights were on. An entrance artificial light is seen in Figure 8.

4.2.5.    High levels of contrast (dark and bright) and overall dimness (darkness) within the covered galley area was clearly visible and perceivable, as previously seen in Figure 1.

4.2.6.   Horizontal lux levels were measured at the intersection of the grid-line pattern (below each artificial light); as well as outside and inside the restroom door, both with the door open and closed. Figure 9 provides a diagram with the grip-line pattern and locations where lux levels were measured (arrow points to restroom door). A total of 24 lux measurements were taken to determine the overall available lighting at the time of the inspection. Additionally, three background measurements outside the galley area by below the bridge were taken as a reference (indicated with a 'R' in Figure 9). For each measurement, a 3 second wait was implemented prior to each measurement to ensure consistency and lux leveling while recording measurements. Full-tabulated results for the illumination survey is provided in Table 1.

4.2.7.   The average illuminance in the covered  galley area was 110.1

4.2.8.   The average illuminance inside the restroom door (gridline C) was 92.2 and 87.1 lux, with the door open and closed, respectively.

4.2.9.   The average illuminance outside the restroom door (gridline D) was 75.0 and 69.8 lux with the door open and closed, respectively.

4.2.10.  The average reference (R) illuminance next to the galley area was 1813.0 lux (based on three measurements).



Figure 6 – Artificial light sources at inspection site, looking from starboard to port (top);
and port to starboard (bottom) across the covered galley

**Expert Report**



Figure 7 – Exterior artificial light fixture typology



Figure 8 – Artificial light at restroom entrance



Figure 9 – Gridline pattern where lux levels were measured

**Expert Report**

Table 1 – Results for the illuminance measurements

| GRIDLINE | Illuminace (lux) | | | | | | AVERAGE |
|---|---|---|---|---|---|---|---|
| | **1** | **2** | **3** | **4** | **5** | **6** | |
| **A** | 190.5 | 79.3 | 46.5 | 45.5 | 72 | 230.6 | *110.7* |
| **B** | 164.0 | 81.4 | 52.3 | 48.0 | 83.3 | 228.3 | *109.6* |
| *AVERAGE* | *177.3* | *80.4* | *49.4* | *46.8* | *77.7* | *229.5* | **110.1** |
| | **Door Open** | | | **AVERAGE** | | | |
| **C** | 94.8 | 99.1 | 82.8 | *92.2* | | | |
| **D** | 79.9 | 78.9 | 66.3 | *75.0* | | | |
| *AVERAGE* | *87.4* | *89.0* | *74.6* | **83.6** | | | |
| | **Door Closed** | | | | | | |
| **C** | 91.5 | 95.5 | 74.3 | *87.1* | | | |
| **D** | 71.4 | 76.3 | 61.6 | *69.8* | | | |
| *AVERAGE* | *81.5* | *85.9* | *68.0* | **78.4** | | | |

### 4.3.   DOORWAY EVALUATION

The doorway geometry, condition, operation and maintenance was evaluated at the incident location to test the hypothesis. It should be noted that the measuring equipment during the evaluation of the doorway was conditioned for a minimum period of 20 minutes prior recording measurements, providing sufficient time to ensure dimensional compensation changes due to environmental effects. Measurements were recorded with a tape, a Leica DISTO D2 (a hand held laser distance-meter) with an accuracy of 1/16 (0.06) of an inch, and a caliper with a precision of 1/1000 (0.001) of an inch. Angles were measured with a digital angle-measuring level with an accuracy of 0.2-degrees. Interpretations of the doorway evaluation are provided in Section 5. The following was tested and recorded:

4.3.1.   The doorway at the incident location, as seen in Figure 4, had an average height, and width equal to 79.83 and 36.63 inches, respectively; based on three measurements.

4.3.2.   The doorway opened outwards with a right hinge, and had a transparent porthole window and a sign indicating the female restroom.

4.3.3.   The handle to the door was lever type and metallic as seen in the close up in Figure 10.

4.3.4.   The doorway had a raised threshold with a metallic liner. Figure 11 shows the elevation from the inside and outside of the restroom as well as the plan view of the threshold.

4.3.5.   The raised threshold cross-section is sketched and measurements defined in Figure 12.

4.3.6.   The average threshold cross-section dimensions (based on six measurements made equidistant on along the length at six inches center on center) are reported in Table 2.



Figure 10 – Door handle, interior (right) and exterior (left)



Figure 11 – Doorway raised threshold.
From top to bottom: interior elevation, plan view and exterior elevation



Figure 12 – Doorway raised threshold cross-section

**Expert Report**

Table 2 – Threshold cross-section dimensions

| Measurement (ref. Figure 9) | Dimension along the Threshold Length (inches) @ 6 inches | | | | | | AVERAGE (inches) |
|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | |
| $H_i$ | 2.586 | 2.534 | 2.649 | 2.623 | 2.661 | 2.621 | **2.612** |
| $H_{o1}$ | 2.631 | 2.640 | 2.653 | 2.651 | 2.601 | 2.612 | **2.631** |
| $H_{o2}$ | 0.399 | 0.362 | 0.412 | 0.412 | 0.434 | 0.423 | **0.407** |
| $H_o = H_{o1} + H_{o2}$ | 3.030 | 3.002 | 3.065 | 3.063 | 3.035 | 3.035 | **3.038** |
| $W_1$ | 2.859 | 2.888 | 2.894 | 2.930 | 2.288 | 2.907 | **2.794** |
| $W_2$ | 1.609 | 1.508 | 1.590 | 1.590 | 1.598 | 1.619 | **1.586** |
| $W = W_1 + W_2$ | 4.468 | 4.396 | 4.484 | 4.520 | 3.886 | 4.526 | **4.380** |
| $H_o - H_i$ | 0.444 | 0.468 | 0.416 | 0.440 | 0.374 | 0.414 | **0.426** |

## 5. INTERPRETATIONS

The results and evidence obtained from the inspection conducted on December 9, 2017, on board the vessel Norwegian Epic, deck 15, port, aft, by the public female restroom; in relation to the incident of Ms. Cheryl Milbrath, which occurred on November 20, 2016; are interpreted in this section of the report to complete the scientific methodology and establish the cause-effect relationship related to the incident. The aim is to determine the likelihood of the environmental factors that may and may have not caused the fall. The aforementioned hypothesis is re-stated below.

> ➢ The cause of Ms. Cheryl Milbrath's fall is a combination of environmental deficiencies including, the floor surface, lighting conditions and doorway.

5.1. VISUAL ANALYSIS

From the visual analysis results, it can be inferred that:

5.1.1. The area around the covered galley was an ADA accessible path, as indicated by the presence of the ADA elevator.

5.1.2. CCTV looking from the ADA elevator towards the female restroom entrance may provide additional evidence to assess the cause-effect relationship related to the incident assuming CCTV is operational and video footage record available.

5.1.3. Per Ms. Cheryl Milbrath, during the night of the incident there was no rain, nor other adverse weather conditions. It can be inferred that it is highly likely that weather was not a contributing factor to the incident.

5.1.4. The galley area surface floor and skirting (or baseboard) had the same finish and color. This creates a lack of contrast between where the floor finishes and where the wall begins, making it difficult to differentiate floor and non-floor surface.

5.1.5. The floor surface traction appeared to be reasonable in the dry condition and thus is highly likely that was not a contributing factor to the incident.

5.2. LIGHTING EVALUATION

Although the exterior artificial lights were not on at time of inspection, from the lighting evaluation the following can be interpreted:

5.2.1. Since the lights are connected to automatic timers (per disclosure by Defendant's council at time of inspection), rather than an illuminance sensor; light is not available based on environmental conditions, and thus can lead to issues of contrast (between bright and dark) resulting in poor or inadequate lighting, as was the case during the inspection. This observation was supported by the high difference between the reference illuminance (next to the galley area) and the average illuminance in the galley area.

5.2.2. The Engineering Society of North America (IES) is recognized as the leading technical authority on illumination. Per the IES, the galley area can be generally classified as an area for 'orientation and simple tasks.' These tasks occur in public spaces where reading and visual inspection are only occasionally performed. Within this classification, due to the restroom and access type with raised threshold as a working space for simple visual tasks, the recommended IES lighting level is 10 foot candle (equivalent to 108 lux).

5.2.3.     Although the average illuminance within the entire galley area met the industry recommendations, the lighting levels in the area by the restroom doorway were inadequate, by more than 50% less of the minimum recommendation.

5.2.4.     Moreover, the average illuminance inside the restroom (with the door closed) was also inadequate and below recommendations, specially given the presence of the change in floor elevation due to the threshold at the doorway entrance.

5.2.5.     Extensive research indicates that poor lighting of a space can lead to misreading the surface, where any changes in level or edges can cause faulty foot placement, tripping and result in an accident (Templer 1995, Peake 1999, Gauchard 2001, Dusek 2011). This was the situation found the inspection, and is especially critical to provide adequate lighting to notice the presence of the threshold. Proper lighting results a reduced risk of falls, tripping and accidents when such industry standards are adequately implemented.

## 5.3.    DOORWAY EVALUATION

From the doorway evaluation it can be interpret that:

5.3.1.     The door had standard dimensions for its application, opening outwards due to fire requirements.

5.3.2.     The door appears to have had maintenance in the past, as indicated by the trace left on the door surface from a previous door handle, as seen in Figure 10.

5.3.3.     The door had a threshold with a dull metallic appearance. This results in a blending effect with the floor and skirting (baseboard) surface color when approaching the door from the outside as seen in Figure 13. It is not possible to clearly distinguish the threshold size and magnitude when approaching the restroom.

5.3.4.     Hence there was no noticeable contrast between floor and threshold, and therefore results in a dangerous tripping threshold condition due to the resulting camouflaged setting, where no measures were taken by those in control of the vessel to ensure that the dangerous condition posed by the threshold was clearly visible to any user.

5.3.5.     The average exterior height of the threshold was 3.04 inches, which is more than 600% higher than the maximum height of doorway thresholds permitted by well established and recognized numerous build environment codes (ADA, IBC, NFPA), typically established at a maximum of 0.50 inches.

5.3.6.     It is recognized that significant changes in elevations, specially in doorways, or transition points, are a dangerous condition that when exceeding 0.5 inches, increases significantly the risk of falls (Anderson 1983, Jensen 2005, Aziz and Stephen 2011, Dusek 2011). Thus, the threshold at the public female restroom clearly represents a dangerous condition.

5.3.7.     This dangerous condition was known to those in the control of the vessel in two evident ways:

5.3.7.1. Equivalent incidents have been reported at the same location, as stated within the Defendant's notice of serving amended answers to Plaintiff's first interrogatories, dated August 11, 2017. It should be noted that the two reported incidents occurred both at night and during the day, reinforcing the camouflaged setting of the threshold as well as the dangerous condition.

5.3.7.2. The safety video extract about raised thresholds (provided as evidence by the Defendant, Figure 14), thus a safety concern. Moreover, the depicted threshold in the safety video appears to be approximately 0.5 inch height, and clearly is different to the extremely raised threshold related to the incident.

5.3.8.    In circumstances when such dangerous thresholds should occur, industry standards and best practices recommend the use of permanent caution signs that are visually conspicuous (Jensen 2005, Dusek 2011). Signs are typically placed either on the door or wall surrounding the entrance, such as that seen in the International Maritime Organization (IMO) approved sign in Figure 15; or alternatively placed directly on the dangerous threshold condition, such as that seen in Figure 16, providing an example from another existing cruise ship threshold caution sign.

5.3.9.    It is well-known that such signs significantly reduce the risk of tripping and falls. Such signs alert of immediate danger on an unknown and known condition, and are used to exercise reasonable care by owner and operators of vessels; hence reducing the risk of falls.

5.3.10.    The absence of warning or caution signs represents a lack of reasonable care under the circumstances, which would have alerted of the known hazard posed by the significantly elevated doorway threshold.



Figure 13 – Restroom doorway showing how threshold is blended with the floor surface



Figure 14 – On board safety video extract related to thresholds



Figure 15 – Example of representative caution sign approved by
International Maritime Organization (IMO)



Figure 16 – Example from a cruise ship threshold caution sign

## 6.    CONCLUSIONS

The scientific method was used to determine the cause and effect relationship of the incident involving Ms. Cheryl Milbrath. With the collected evidence during the vessel inspection, peer reviewed studies and applicable references, as well as my education, professional experience, training and understating of applicable requirements and standards, it is my opinion that the likelihood, which significantly increased the risk of the fall by Ms. Cheryl Milbrath was due to the following combined environmental factors:

➢  There is a low likelihood that inadequate weather or floor traction conditions contributed to the fall.

➢  Although poor lighting conditions were observed and evaluated during the inspection, it is inconclusive if defective or inadequate lighting conditions may have been a contributing factor of the fall at the time of the incident. Further measurements are needed to provide a determination.

➢  There is a high likelihood that the significant threshold elevation in combination with a lack of cautionary measures contributed to the fall.

In conclusion, knowing the hazardous condition due to previous equivalent indicents at the same location and the broadcast of a safety video about thresholds (not raised more than about 0.5 in); the subject threshold exceeded its height more than 600% of the typical 0.50 inch tall threshold (as shown in the safety video) poses a high risk of falls. The dangerous condition was known and appreciated by those in control of the vessel. Such condition was camouflaged with the surroundings, creating a tripping hazard condition that was not clearly visible.

Furthermore, the absence of use of a cautionary sign/s that is necessary for reasonable safe pedestrian access, would have significantly reduced the risk of a fall. In fact, such type of cautionary measures are widely used within the cruise line industry as means to exercise reasonable care, as presented herein.

## 7.    REFERENCES

Anderson, D. M. "From accident report to design problems—A study of accidents on board
      ship." Ergonomics 26, no. 1 (1983): 43-50.

Aziz, Omar, and Stephen N. Robinovitch. "An analysis of the accuracy of wearable sensors for
      classifying the causes of falls in humans." IEEE transactions on neural systems and
      rehabilitation engineering 19, no. 6 (2011): 670-676.

Chang, Wen-Ruey. "A statistical model to estimate the probability of slip and fall
      incidents." Safety Science 42.9 (2004): 779-789.

Dahl, Eilif. "Passenger accidents and injuries reported during 3 years on a cruise ship." Int Marit
      Health 61.1 (2010): 1-48.

Dusek, Glenn. "Smart Safety Design to Prevent Slips, Trips and Falls." ASSE Professional
      Development Conference and Exposition. American Society of Safety Engineers, 2011

Gauchard, G., et al. "Falls and working individuals: role of extrinsic and intrinsic factors."
      Ergonomics 44.14 (2001): 1330-1339.

Jensen, Olaf C., et al. "Non- fatal occupational injuries related to slips, trips and falls in
      seafaring." American journal of industrial medicine 47.2 (2005): 161-171

Lawton, M. P., and Nahemow, L. "Psychology of adult development and aging". Ecology and the
      aging process. Washington D.C. American Psychological Association (1973)

Lois, P., et al. "Formal safety assessment of cruise ships." Tourism Management 25.1 (2004):
      93-109

Miller, B.C., 1994. In plane view: blind spots and visual limits. Occupational health and safety,
      63(5), pp.98-102.

Peake, Dwight Edward, et al. "Descriptive epidemiology of injury and illness among cruise ship
      passengers." Annals of emergency medicine 33.1 (1999): 67-72

Templer, J., 1995. The staircase: studies of hazards, falls, and safer design. MIT press.

**♦ END OF REPORT ♦**